| UNITED STATES DISTRICT COURT | NOT FOR PUBLICATION |
| EASTERN DISTRICT OF NEW YORK | |

------------------------------------------------------------ X
EDWIN FERNANDEZ and ELIZABETH FERNANDEZ,

                   Plaintiffs,

         - against -

POLICE OFFICER SALVATORE SACCO (Shield No. 6969), POLICE OFFICER MICHAEL VOLPICELLA (Shield No., 1155), POLICE OFFICER CHRISTOPHER ENG (Shield No. 15563), POLICE OFFICER RICHARD DIGANGI (Shield No. 16130), POLICE OFFICER JOHN DOES 1-4, and THE CITY OF NEW YORK,

                   Defendants.

------------------------------------------------------------ X

**MEMORANDUM & ORDER**

No. 10 CV 1624 (ERK) (RML)

KORMAN, J.:

      Edwin and Elizabeth Fernandez live in the front apartment of a two-family home at 288 Ada Drive in Staten Island. Def. 56.1 Stmnt. ¶ 7, ECF No. 31; Pl. 56.1 Stmnt. ¶¶ 2-3, ECF No. 33. The property is owned by William and Beverly Fonseca. *Id*. On the morning of December 19, 2009, the Fernandezes were in their home with their son (who was 15 years old), youngest daughter (who was 14 years old) and Mrs. Fernandez's mother (who was 82 years old). *Id*. ¶ 5. Around 9:00 a.m., the Fonsecas (the Fernandezes' landlords) arrived at the house to conduct routine maintenance. *Id*. ¶ 6. The Fernandezes maintain that there was no dispute of any kind with the Fonsecas that morning. *Id*. Messrs. Fernandez and Fonseca moved some furniture in Mrs. Fernandez's mother's room, which is located on the ground floor of the Fernandezes' apartment. *Id*.

1

The second apartment at 288 Ada Drive was rented by Crystal Roman. *Id.* ¶ 3. At the time of the events at issue, Lisa Roth (Ms. Roman's mother) was babysitting her grandson. Def. 56.1 Stmnt. ¶ 8; Pl. 56.1 Stmnt. ¶ 7. At approximately 9:00 a.m., Ms. Roth made an anonymous call to 911 and stated: "I'm a neighbor at Ada Drive on Staten Island and there's a lot of commotion coming from a house. It's looks, it sounds like a fight and I'm calling . . . I don't know what is going on. Is there a way you can send police over there?" Def. 56.1 Stmnt. ¶ 9; Pl. 56.1 Stmnt. ¶ 11. Ms. Roth continued that "It's so loud that you can hear" and that "It sounds very violent." Def. 56.1 Stmnt. ¶ 9; Pl. 56.1 Stmnt. ¶ 11. In response to the 911 operator's questions, Ms. Roth further stated that "it sounds like a group . . . . A group of people" and that she did not know whether there were any weapons or injuries. Def. 56.1 Stmnt. ¶ 9; Pl. 56.1 Stmnt. ¶ 12. Specifically, Ms. Roth added that the argument had gone on for "a good 10-15 minutes" and that "you can hear the scuffling." Def. 56.1 Stmnt. ¶ 9; Pl. 56.1 Stmnt. ¶ 12. She later clarified that the people at issue were accessible from the "first floor front door." Def. 56.1 Stmnt. ¶ 9; Pl. 56.1 Stmnt. ¶ 12.

At 9:07 a.m., the 911 operator dispatched two police patrol cars, each containing two officers. Def. 56.1 Stmnt. ¶ 10; Pl. 56.1 Stmnt. ¶ 15. Specifically, the 911 operator stated: "Respond to a 52 dispute at 2-8-8 Ada Drive. 2-8-8 Ada Drive. Ellison Court is the cross. States that a large group of people is having a dispute in a private house. Unknown weapons, unknown injuries." Def. 56.1 Stmnt. ¶ 10; Pl. 56.1 Stmnt. ¶ 17. This was the only information about the contents of the 911 call communicated to the responding officers, who did not hear the call themselves. *Id.* ¶¶ 14, 17. A "52" is a police code for a "generic dispute," as opposed to police code "52-F," which is the code for a domestic dispute. *Id.* ¶ 19.

The responding officers were defendants Officer Salvatore Sacco, Sergeant Michael Volpicella, Officer Christopher Eng, and Officer Richard DiGangi. They arrived at approximately 9:11 a.m. *Id.* ¶ 20. They did not hear or observe any sign of a dispute at that time. *Id.* ¶ 23. They then knocked on the door of the Fernandez residence. Def. 56.1 Stmnt. ¶ 10; Pl. 56.1 Stmnt. ¶¶ 22, 25. The parties disagree whether the door was answered at that time. The Fernandezes claim that Mr. Fernandez answered the door and had a brief conversation with the officers. *Id.* ¶ 25. Specifically, Mr. Fernandez claims that the officers told him that someone called 911 and reported a fight at his address. *Id.* ¶ 25. Mr. Fernandez claims that he responded that his family had not called 911 and that there had been no one fighting inside their apartment. *Id.* ¶ 25. However, defendants claim that they waited 1-2 minutes after knocking but the door went unanswered. Def. 56.1 Stmnt. ¶ 10.

At that point, the officers placed a radio call to central command and were informed that the 911 call had come from the "side" apartment. *Id.* ¶ 11; Pl. 56.1 Stmnt. ¶ 26. The officers then proceeded to knock on the door of the rear apartment, which was answered by Ms. Roth. Def. 56.1 Stmnt. ¶ 11; Pl. 56.1 Stmnt. ¶ 28. Ms. Roth denied making the 911 call but told the officers she heard a "loud ruckus upstairs," that she heard "loud voices," and that it sounded like an argument. Def. 56.1 Stmnt. ¶ 11; Pl. 56.1 Stmnt. ¶ 32.

After the conversation with Ms. Roth concluded, the officers returned to the Fernandezes' door at the front of the property. Def. 56.1 Stmnt. ¶ 12; Pl. 56.1 Stmnt. ¶ 41. Mr. Fernandez answered the door and denied that there had been a fight or dispute inside the apartment. Def. 56.1 Stmnt. ¶ 12; Pl. 56.1 Stmnt. ¶¶ 41, 43. Significantly, the parties disagree on Mr. Fernandez's appearance at that time. Defendants claim that Mr. Fernandez had redness and swelling on his neck, face and knuckles, and some "slight blood" on his knuckles. Def. 56.1

Stmnt. ¶ 12. The Fernandezes claim that there were no injuries on Mr. Fernandez's "face, hands or body." Pl. 56.1 Stmnt. ¶¶ 58-59. According to the Fernandezes, Mr. Fonseca was also present at the door and told the officers that he and his wife had been at the house since 9:00 a.m. that morning and they had not seen or heard anyone arguing or fighting. *Id*. ¶ 43. In addition, the Fernandezes claim that Mrs. Fernandez also told the officers that there had been no fighting. *Id*.

The officers then told Mr. Fernandez that they "needed" to enter the apartment and check that nobody was injured. Def. 56.1 Stmnt. ¶ 13; Pl. 56.1 Stmnt. ¶ 45. When Mr. Fernandez refused to allow the officers to enter the apartment, Officer Sacco used his forearm to push Mr. Fernandez aside. Def. 56.1 Stmnt. ¶ 13; Pl. 56.1 Stmnt. ¶ 52. The Fernandezes claim that Officer Sacco pinned Mr. Fernandez against the wall and screamed for him to "move the fuck out of the way" and threatened arrest. *Id*. ¶ 52. The officers then conducted a visual inspection of the apartment that lasted 5-10 minutes. Def. 56.1 Stmnt. ¶ 14; Pl. 56.1 Stmnt. ¶¶ 52, 62.

Upon entering the apartment, Officer DiGangi claims that the house was "in shambles, furniture was moved out of the way," and the plaintiff's son was "panting, sweating and his face was red." Def. 56.1 Stmnt. ¶ 14. According to Officer DiGangi, in addition to sweating and panting, the young person in the apartment was also cursing and appeared to be upset about something. *Id*. ¶ 14. Sergeant Volpicella asked the plaintiffs' son if everything was okay. *Id*. ¶ 14; Pl. 56.1 Stmnt. ¶ 62. According to Sergeant Volpicella, their son responded he had been "play fighting." Def. 56.1 Stmnt. ¶ 14. The details of these interactions are disputed by the plaintiffs. *See* Pl. 56.1 Stmnt. ¶¶ 62-63.

The encounter ended when the officers departed the location. One of the officers noted the final disposition of the case in his memo book as "90Y (highly uncooperative)," which was

later explained by that officer to mean "unnecessary" – "it wasn't necessary for us to be there." *Id*. ¶ 66.

## PROCEDURAL HISTORY

The Fernandezes subsequently filed a complaint, which they later amended, that sets forth three causes of action pursuant to 42 U.S.C. § 1983 against the following defendants: (1) Officer Sacco, Sergeant Volpicella, Officer Eng and Officer DiGangi; (2) Officer John Does 1-4; and (3) the City of New York. The first two causes of action allege that the officers unconstitutionally entered and searched the Fernandez home on December 19, 2009, in violation of their rights under the Fourth Amendment. Am. Compl. ¶¶ 33, 43, ECF No. 22. The third cause of action alleges that the purported unconstitutional entry and search was ordered or conducted pursuant to a pervasive custom or practice of the New York City Police Department that had been approved by the City of New York or was one that the City was or should have been aware of. *Id*. ¶ 54. On April 2, 2012, the defendants filed this motion for summary judgment.

## DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. And a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The mere existence of a

scintilla of evidence in support of the plaintiff[s'] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff[s]." *Id.* at 252.

"The burden of demonstrating that no material fact exists lies with the moving party." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (per curiam) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)). If the movant satisfies this initial burden, then the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of fact exists. *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir. 1993). Summary judgment is mandated, however, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). And, in ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed," *Anderson*, 477 U.S. at 255, and "[a]ll ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor," *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (per curiam) (citing *Anderson*, 477 U.S. at 255).

The Fernandezes assert that the officers' warrantless search of their home violated the Fourth Amendment. Defendants argue that they are entitled to summary judgment on this claim because: (1) their conduct was justified by the exigent circumstances – specifically, the need to render assistance to potentially injured individuals, Def. Mem. at 6, ECF No. 30; and (2) they are protected by qualified immunity, *id.* at 8-11.

I.   *Exigent Circumstances*

It is undisputed that the officers entered and conducted a visual search of the Fernandez home without a warrant. "Warrantless searches are presumptively unreasonable." *Kerman v. City of New York*, 261 F.3d 229, 235 (2d Cir. 2001) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)). Nevertheless, warrantless entries into a home "are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement." *Kentucky v. King*, 563 U.S. ----, 131 S. Ct. 1849, 1858 (2011). Thus, "'police officers may enter a dwelling without a warrant to render . . . assistance to a person whom they reasonably believe to be in distress.'" *Kerman*, 261 F.3d at 235 (quoting *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998)).

In determining whether exigent circumstances exist, "[t]he essential question . . . is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (en banc) (citing *Dorman v. United States*, 435 F.2d 385, 391 (D.C. Cir. 1970)). The mere "possibility" of danger, however, does not justify a warrantless entry. *Hurlman v. Rice*, 927 F.2d 74, 81 (2d Cir. 1991). Instead, the police officers must have probable cause to believe "a person is in 'danger.'" *Kerman*, 261 F.3d at 236 (citing *Tierney*, 133 F.3d at 196-97). "However, '[t]his probable cause requirement[ ] must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences.'" *Tierney*, 133 F.3d at 196-97 (quoting 3 Wayne LaFave, *Search and Seizure* § 6.6(a), at 391 (3d ed. 1996)). Thus, "[c]ourts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief

7

that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." *Id*. at 197.

Defendants rely on the factual assertion that Mr. Fernandez had redness and swelling on his neck, face and knuckles, and some "slight blood" on his knuckles when he answered the door. Def. Mem. at 7-8. Two of the officers noted such injuries in their memo books on the day of the incident. Pl. 56.1 Stmnt. ¶ 56. While plaintiffs' counsel conceded at oral argument that, if true, this condition of Mr. Fernandez would have materially have affected the probable cause calculus, he correctly observed that there was a triable issue of fact. Consequently, as the defendants concede, their motion depends solely on whether the other information they had available provided probable cause that there was someone in the apartment in distress. *See* Def. Mem. at 8.

Two Second Circuit cases are most relevant to this analysis: *Kerman* and *Anthony v. City of New York*, 339 F.3d 129 (2d Cir. 2003). In *Kerman*, police officers responded to the plaintiff's apartment based on a 911 call made anonymously from a different location. 261 F.3d at 232. The caller had told the 911 operator that "a mentally ill man at this location was off his medication and acting crazy and possibly had a gun." *Id*. In the caller's conversation with the 911 operator, she did not mention her relationship to the plaintiff nor did she provide the plaintiff's name. *Id*. When the officers arrived, the plaintiff "opened the door a crack" in response to the officers. *Id*. The officers then forcibly entered the apartment. *Id*. Under these circumstances, the Second Circuit held that the warrantless entry into the plaintiff's apartment violated the Fourth Amendment because the uncorroborated 911 call was insufficient to provide the probable cause to believe there was an urgent need to render aid to a person in distress. *Id*. at 236. This holding rested on the absence of evidence in the record to corroborate the 911 call and

the fact that private dwellings are "ordinarily afforded the most stringent Fourth Amendment protection." *Id*. (quoting *Ayeni v. Mottola*, 35 F.3d 680, 685 (2d Cir. 1994), *abrogated on other grounds by Wilson v. Layne*, 526 U.S. 603 (1999)).

By contrast, in *Anthony*, police officers responded to a 911 call "in which a female caller reported that she was being attacked by a man with a knife and a gun." 339 F.3d at 131. The apartment to which the officers responded was also the apartment from which the 911 call was made. *Id*. Based on those facts, the Second Circuit held the officers' forced entry was justified by exigent circumstances. *Id*. at 136-37. Specifically, it observed that *Anthony* was unlike *Kerman* because "the call came from the same location to which police responded, and, more importantly, the caller described an immediate and deadly threat of harm to which she herself was being exposed at that location." *Id*. at 136. Unlike *Anthony*, the information Ms. Roth provided did not originate inside the apartment that the officers forcibly entered and searched. Nevertheless, the police spoke to the neighbor, Ms. Roth, whom the evidence clearly suggests was the 911 caller. Specifically, the 911 operator was able to trace the call to second apartment in the two-family house in which the Fernandezes resided. Moreover, Ms. Roth said she was babysitting her grandson. While these facts take this case out of the realm of a search based on an anonymous call, the problem is that Ms. Roth's report of a "loud ruckus upstairs" and "loud voices" that "sounded like an argument" did not rise to the danger and immediacy, nor did they contain the specificity, of the *Anthony* report that the caller herself was presently being attacked with deadly weapons. Significantly, on the basis of the record on which this motion must be resolved, the observations of the police officers were not sufficient to raise any concern about the safety of persons inside the Fernandez home.

9

A more recent case discussing *Kerman* and *Anthony* is also instructive here. In *United States v. Sikut*, an anonymous 911 call was placed by an anonymous neighbor reporting "a domestic" at the plaintiff's home. 488 F. Supp. 2d 291, 297 (W.D.N.Y. 2007). The caller reported that the noise in the plaintiff's apartment "sounds like a physical fight, you can hear people going at the walls, rumbling down stairs, it's really aggravating." *Id*. A police officer was dispatched to respond to the "domestic" and was informed that the police had received a similar phone call four months earlier with a similar report about the same location which turned out not to be a "domestic," but instead was an elderly male that had fallen in the apartment's kitchen. *Id*. Upon arrival, an officer knocked on the front door, rang the doorbell and announced himself as a police officer. *Id*. The door went unanswered. *Id*. The officers could not see inside the apartment because the shades were drawn and there were no signs of activity within the apartment. *Id*. at 298. At that point, the officers spoke with a woman who resided in an adjoining apartment who admitted to making the 911 call. *Id*. She repeated the statements that she made earlier on the 911 call. *Id*. After a brief investigation of "the matter to determine its potential exigency," the officers entered the apartment through a rear door to the apartment, which they claim to have found unlocked. *Id*. at 299. Based on these facts, the district judge held that based on the prior inaccurate 911 call and "the absence of independent evidence directly corroborating the present caller's complaint, it was not objectively reasonable for the officers to conclude that the 911 caller was sufficiently reliable to demonstrate that exigent circumstances were present." *Id*. at 308-09.

As in *Sikut*, the information relayed to the police officers in the instant case was "not [from] the alleged victim, nor from a person within the potential victim's residence." *Id*. at 307. Both of these factors distinguish both *Sikut* and this action from *Anthony*, in which the 911

10

"caller expressed the belief that she faced 'an immediate and deadly threat of harm.'" *Id*. (quoting *Anthony*, 339 F.3d at 136-37). Moreover, the report by the 911 caller in *Sikut* is remarkably similar to Ms. Roth's report (both the 911 call and in person). Both described the general sounds of an altercation but were non-specific and could not be corroborated by the responding officers' observations. On the contrary, the appearance of the Fernandezes and Fonsecas at the door to the Fernandez home and the alleged insistence of all four that nothing was amiss arguably suggests an inference that there was no immediate need for an exigent-circumstances entry.

## II. Qualified Immunity

"Because 'damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties,' *Anderson* [*v. Creighton*], 483 U.S. [635,] 638 [(1987)], the identification and disposal of insubstantial claims by summary judgment is encouraged. *Id.* at 640 n.2; *Butz v. Economou*, 438 U.S. 478, 507-08 (1978); *see Mitchell* [*v. Forsyth*], 472 U.S. [511,] 526 [(1985)] (the qualified immunity entitlement is an '*immunity from suit* rather than a mere defense to liability; and . . . is effectively lost if a case is erroneously permitted to go to trial'); *In Re State Police Litigation*, 88 F.3d [111,] 123 [(2d Cir. 1996)]." *Lee v. Sandberg*, 136 F.3d 94, 101-02 (2d Cir. 1997).

"'[A] qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'" *Wilkinson ex rel. Wilkinson v. Russell,* 182 F.3d 89, 103 (2d Cir. 1999) (quoting *Tierney*, 133 F.3d at 196). The first prong of the qualified immunity defense is not at issue here. The law is clearly established that a warrantless entry into a home,

even to render assistance to a person in need, requires probable cause that was lacking here. Nevertheless, even where the record fails to establish the existence of probable cause, police officers may be entitled to qualified immunity if they reasonably believed that they had probable cause.

At first blush, the two issues appear to involve the same question. As then-Chief Judge Newman observed, "there is a seeming circularity to inquiring first whether the circumstances as perceived by a reasonably prudent police officer would justify the belief that the persons to be arrested had committed a crime, and, after finding that the circumstances would not justify a belief, proceeding to inquire whether a police officer could reasonably believe that the officer's conduct was lawful." *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994). "[W]e have been authoritatively instructed," however, "that the objective reasonableness component of the inquiry as to lawfulness is not the same as the objective reasonableness component of the inquiry as to qualified immunity." *Id*. Indeed, in *Anderson*, the Supreme Court considered and rejected a contention that it is not possible to say "one 'reasonably' acted unreasonably." *Anderson*, 483 U.S. at 643. As Judge Newman continued in *Oliveira*, "[t]he result of the distinction between reasonableness as a component of a Fourth Amendment violation and reasonableness as a component of an immunity defense is that an officer is protected in some circumstances even when he 'mistakenly conclude[s] that probable cause is present.'" *Oliveira*, 23 F.3d at 649 (quoting *Anderson*, 483 U.S. at 641).

Judge Newman's opinion in *Oliveira* contains one more observation that is pertinent to this case. Specifically, he wrote "[t]hough [i]mmunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required. Of course, as with any issue of

nominally disputed fact, if the state of the evidence is such that reasonable jurors could reach only one conclusion, then that factual issue is appropriate for decision by the court as a matter of law. Thus, the question . . . is whether . . . a jury could reasonably conclude that it was objectively reasonable for the defendants to have believed that their [entry into the Fernandezes' apartment] was lawful." *Id*. (internal quotation marks and citations omitted). Moreover, because qualified immunity is an affirmative defense, on this issue the defendants bear the burden of proof on a motion for summary judgment or at trial. *Lee*, 136 F.3d at 101 (citing *State Police Litig.*, 88 F.3d at 123).

Defendants rely on the Second Circuit's *Tierney* decision and a case from the Eastern District of Pennsylvania, *Daniels v. County of Media*, No. CIV. A. 00-CV-911, 2001 WL 487859 (E.D. Pa. Mar. 5, 2001). In *Tierney*, a police officer responded to a 911 call regarding "what he was told was a 'bad' domestic disturbance, the worst yet at this location according to experienced observers." 133 F.3d at 197. Upon arrival, the officer "was informed by neighbors that the shouting had ended right before his arrival; and as he approached the house, [the officer] heard nothing and found a broken window pane." *Id*. The officer then "opened the door through the broken pane, and entered the house without knocking or identifying himself." *Id*. at 192 n.2. In that situation, the Second Circuit held that the officer was entitled to qualified immunity because "[i]t was reasonable for [the officer] to believe that someone inside had been injured or was in danger . . . and that this situation satisfied the exigent circumstances exception." *Id*. at 197.

The present case is distinguishable from *Tierney* in several respects. First, Ms. Roth's 911 call and in-person statements did not describe the noises that she heard as a "domestic disturbance." While the defendants discount the significance of this distinction, the case law

recognizes the "combustible nature" of these disputes and the need to accord great latitude to an officer's belief that a warrantless entry is necessary in those circumstances. *Id*. Indeed, the New York City Police Department apparently attaches significance to domestic disputes by according them a specific police code, different from a general dispute. *See* Pl. 56.1 Stmnt. ¶ 19. Second, the 911 call in *Tierney*, as in *Anthony*, was made by a potential victim with personal knowledge. Third, there was no observable evidence of a fight or dispute – such as a broken window pane – in this action. Fourth, unlike *Tierney*, in which no one answered the door, here, according to the Fernandezes, they and the Fonsecas were present at the doorway and calmly explained to the officers that no dispute had occurred and that the officers' assistance was unnecessary.

In *Daniels*, police officers responded to a 911 call, placed by the plaintiff himself, which indicated that a domestic disturbance was in progress at the plaintiff's residence. 2001 WL 487859, at *3. The plaintiff had asserted, without any proof thereof, that "he had called the police again, prior to the officers' arrival, to inform them that the argument had subsided." *Id*. In support of his case, the plaintiff did not provide "any evidence which would suggest that circumstances at the residence would have indicated to a reasonable person that entry into the home was not necessary." *Id*. Moreover, the plaintiff had offered no evidence to contest the claim that, upon arrival at the plaintiff's home, the officers observed the plaintiff in a "heated discussion with his wife, and that he appeared to be intoxicated." *Id*. In fact, the district judge noted that the plaintiff's "only response to the Defendants' evidence is his assertion . . . that warrantless entries by the police without the homeowner's consent are per se unconstitutional." *Id*. at *4. In that situation, the district judge concluded that the officers' actions were objectively reasonable because there was no "information available to the officers to contradict their

understanding that a domestic dispute was in progress and that it was necessary to enter the residence in order to prevent possible harm to persons inside the home." *Id*. at *3.

*Daniels* is likewise distinguishable for much the same reasons as *Tierney*. Significantly, there is a genuine factual dispute as to whether Mr. Fernandez appeared injured when he spoke with the officers prior to their forced entry into his home. In *Daniels*, the officers observed the plaintiff "appeared to be intoxicated" and was in a "heated discussion" with his wife. The *Daniels* plaintiff did not dispute these allegations. Unlike *Daniels*, the only comparable allegation in this action – that Mr. Fernandez appeared injured when speaking to the officers – is highly contested.

In sum, the present case is one in which the reasonableness inquiry is one in which jury consideration is normally required because the facts concerning the availability of the qualified immunity defense are disputed. *See Oliveira*, 23 F.3d at 649. Moreover, to the extent that the facts are undisputed, they not only fall short of probable cause, they are insufficient to justify summary judgment in favor of the defendants on the issue of qualified immunity. Indeed, a case involving the issue whether "one 'reasonably' acted unreasonably," *Anderson*, 483 U.S. at 643, is best decided at trial where all the evidence can be fully developed. While the defendants are entitled to have the issue resolved at this point (as I have done), I reserve the option to revisit the issue after trial.

**CONCLUSION**

The motion of the individual defendants for summary judgment is denied. The motion of the City of New York to dismiss the claims against it with prejudice is granted.

SO ORDERED.

Brooklyn, New York
December 10, 2012

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge